1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10
11

MOISES OLIVAS, *individually and*
*on behalf of others similarly situated*,

12
13

Plaintiff,

14

v.

15

THE HERTZ CORPORATION,

16
17

Defendant.

Case No. 17-cv-01083-BAS-NLS

**ORDER GRANTING MOTION
TO COMPEL ARBITRATION**

**[ECF No. 14]**

18
19

Plaintiff Moises Olivas brings this putative class action against Defendant The

20

Hertz Corporation. He challenges the company's practice of charging administrative

21

fees to rental car customers in connection with their use of toll roads. Hertz moves to

22

compel arbitration of Plaintiff's claims or, in the alternative, to dismiss his claims as

23

implausible. (ECF No. 14.) Plaintiff opposes. (ECF No. 19.)

24

The Court finds this motion suitable for determination on the papers submitted

25

and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the

26

following reasons, the Court grants Hertz's motion to compel arbitration and

27

terminates as moot its motion to dismiss Plaintiff's claims.

28

//

# I. BACKGROUND

## A. Plaintiff's Allegations

Plaintiff Moises Olivas resides in New Jersey.[1] (Compl. ¶ 8.) Defendant The Hertz Corporation "is the world's largest airport general-use car-rental company with more than 2,900 airport locations, including 1,600 in the United States." (*Id.* ¶ 10.) As detailed below, this action stems from Plaintiff renting a car from Hertz in Southern California, which led to Hertz charging Plaintiff a $30 administrative toll fee after he incurred a toll violation during his rental.

### 1. Rental Car Arrangements

Plaintiff is one of Hertz's "Gold Plus" members. (Compl. ¶ 28.) To attain this status, Plaintiff "enrolled in Hertz's Gold Plus program on Hertz's website, www.hertz.com," by completing a form with personal information. (*Id.* ¶ 22.) Plaintiff then "adopted an electronic signature and clicked an 'I Agree' button, acknowledging that [he] had 'received and agree[d] to Hertz's Gold Plus Program Terms and Conditions.'" (*Id.* ¶ 23.)

In November 2014, Plaintiff, "as an existing Gold Plus member who was not making his initial Gold Plus rental, reserved a car for pick up at Hertz's John Wayne Airport location in Santa Ana, California." (Compl. ¶ 28.) He reserved his car online. (*Id.* ¶ 24.) To complete his reservation, Plaintiff "clicked on a 'Submit' prompt, which Hertz's website instructed would confirm that [he] understood and accepted Hertz's Rental Qualification and Requirements" and Gold Plus Program Terms and Conditions. (*Id.* ¶ 27.)

Upon arriving at John Wayne Airport, Plaintiff alleges he proceeded directly to the stall where his rental car waited with the keys inside. (Compl. ¶ 30.) He then

---

[1] Initially, two individuals brought suit against Hertz—Moises Olivas and David Claassen. (Compl. ¶¶ 3–4, ECF No. 1.) Claassen has since voluntarily dismissed his claims. (ECF No. 11.) Further, although the Complaint identifies the remaining Plaintiff as "Moses Oliva," (Compl. ¶ 3), Hertz's records and Plaintiff's counsel indicate that Plaintiff's actual name is Moises Olivas, (Ward Decl. ¶ 2, ECF No. 14-4; Zenger Decl. Exs. 1–4, ECF Nos. 14-8 to 14-11).

drove to the exit gates, where he "joined a queue of cars waiting to leave." (*Id.* ¶ 31.) Plaintiff asserts that, upon reaching the front of the line, an agent handed him through his "driver-side window, a multipage, folded document called a 'Rental Record.'" (*Id.*) Then, with drivers behind him and "rows of metal spikes before [him] preventing [him] from driving anywhere but out," Plaintiff alleges he "left the rental car lot[]." (*Id.*)

### 2. Administrative Toll Fee

During his rental, Plaintiff "drove through a fully automated toll plaza on Highway 73 while driving to San Diego." (Compl. ¶ 32.) Highway 73 uses an electronic toll collection system called FasTrak. (*Id.* ¶ 19.) As a vehicle passes through an electronic toll lane, a transponder in the vehicle identifies the vehicle to the toll system and "records the toll payment and debits the corresponding account." (*Id.* ¶ 11.) This system, however, "recognizes only FasTrak transponders." (*Id.* ¶ 32.) "[Plaintiff] did not have a FasTrak transponder, and Hertz never told him to get one. Therefore, he could not pay the toll as he passed through it." (*Id.*)

Shortly after he returned his rental car to Hertz, Plaintiff received a "Notice of Administrative Fee for Rental Car Toll Charge." (Compl. ¶ 42.) In brief, this notice explained that Hertz would charge Plaintiff a $30 fee in connection with his toll violation. (*Id.* ¶ 47.) This fee did not cover the toll violation itself. (*Id.*) Rather, the fee was for Hertz to transfer liability for the toll violation to Plaintiff. (*Id.* ¶ 46.) The transfer process involves Hertz: (1) receiving a notice for the unpaid toll violation; (2) identifying the customer responsible for the violation; and (3) supplying the legal documents necessary to transfer liability for the violation to the customer's name. (*Id.*) Soon after Plaintiff received this notice, Hertz charged his credit card the $30 administrative toll fee. (*Id.* ¶ 92.)

//

//

### 3. Claims Against Hertz

Plaintiff now brings suit to challenge Hertz's administrative toll fee. He believes this fee over-represents Hertz's costs in processing the unpaid toll. (Compl. ¶ 58.) He relatedly alleges that Hertz failed to notify him before his rental commenced that—among other things—he would incur a toll violation on certain toll roads unless he used his own FasTrak responder or paid FasTrak directly. (*Id.* ¶ 61.)

Based on these allegations, Plaintiff asserts claims against Hertz for breach of contract, breach of the implied covenant of good faith and fair dealing, conversion, and violation of California's Unfair Competition Law, California Business & Professions Code § 17200. (Compl. ¶¶ 74–119.) He also seeks to certify a class action of similarly-situated Hertz Gold Plus members who were charged at least one administrative toll fee. (*Id.* ¶¶ 66–73.)

## B. Hertz's Evidence

### 1. The Gold Agreement

Hertz moves to compel arbitration of Plaintiff's claims. In doing so, the company introduces the following evidence. "Hertz operates a loyalty program called the Hertz Gold Plus Rewards Program (the 'Gold Program')." (Schloss Decl. ¶ 2, ECF No. 14-5.) Plaintiff electronically enrolled in the Gold Program on June 7, 2006. (Zaenger Decl. ¶ 3, ECF No. 14-7.) At that time, the loyalty program was titled "Hertz #1 Club Gold." (*Id.*) Further, when Plaintiff enrolled, he agreed to the "Hertz #1 Club Gold Program Rental Terms & Conditions" ("Gold Agreement"), which Hertz submits "contains the terms and conditions in effect at the time of [Plaintiff]'s November 25, 2014, rental from Hertz's John Wayne Airport Location." (Schloss Decl. ¶ 3, Ex. 1.)

The Gold Agreement applies to all rentals that Plaintiff makes under the Gold Program. (Gold Agreement 1, Schloss Decl. Ex. 1, ECF No. 14-6.) It advises that Plaintiff—at the time of a rental—"will receive a written document (called a 'Rental

Record' or 'Rental Agreement') which contains specific terms of that rental." (*Id.* 2.) "[T]he Rental Record/Agreement may also contain other information pertaining to Car rentals in the jurisdiction in which the rental commences." (*Id.*)

## 2. The Rental Record

"Hertz provides a customized Rental Record to every Hertz customer at the commencement of every rental." (Schloss Decl. ¶ 5.) Consistent with the Gold Agreement, Hertz describes the Rental Record as "a document that contains specific terms of the rental to which it applies." (Schloss Decl. ¶ 5; *see also* Pl.'s Rental Records, Zaenger Decl. Exs. 1–4.)

Using one of Plaintiff's Rental Records as an example, the document is five pages long, but each page is half the width of a typical letter-size page. (*See* Rental Record #589275985, 02 GN, ECF No. 14-10.) The top of the first page identifies the document as a "Rental Record" and lists the customer, rental car, and various rates and fees for the rental. (*Id.*) Next, the Rental Record's second page states: "Further information relating to Your rental charges, and other terms to which You agree, appear below." (*Id.* at 2.) At the time of Plaintiff's rental, the terms in Hertz's Rental Record included the company's "Arbitration Provision" on page four. (*Id.* at 4.) The Arbitration Provision provides for mandatory, individual arbitration of certain claims as follows:

> Except for claims for property damage, personal injury or death, ANY DISPUTES BETWEEN US MUST BE RESOLVED ONLY BY ARBITRATION OR IN A SMALL CLAIMS COURT ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT ALLOWED.
> . . . .
> This Arbitration Provision's scope is broad and includes, without limitation, any claims relating to any aspect of the relationship or communications between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory. It is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq.

(*Id.*)

Further, the Arbitration Provision contains a delegation clause, which seeks to allocate the responsibility for determining questions of arbitrability to the arbitrator:

> In any arbitration under this Arbitration Provision, all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision.

(Rental Record #589275985, 02 GN, at 4.) Finally, after detailing other terms, the provision allows a customer to opt-out of the agreement to arbitrate:

> IF YOU DO NOT WISH TO AGREE TO THIS ARBITRATION PROVISION, YOU MUST NOTIFY US IN WRITING WITHIN 30 DAYS OF YOUR RECEIPT OF THIS AGREEMENT BY EMAILING US AT no.arbitration@hertz.com OR BY MAIL TO . . . . If you have previously notified Hertz of Your decision to opt out of arbitration, You do not need to do so again.

(*Id.*) "Every Rental Record since September 2013 has contained the Arbitration Provision." (Schloss Decl. ¶ 11.) Aside from minor grammatical changes and a change in the name of the American Arbitration Association's Rules, the Arbitration Provision's text "has not changed from September 2013 to the present." (*Id.*)

### 3. Plaintiff's Rental History

Between 2010 and 2016, Plaintiff "engaged in 47 rental transactions with Hertz in the United States." (Zaenger Decl. ¶ 4.) One rental transaction occurred at Hertz's Fort Lauderdale International Airport location on November 8, 2014, which generated two Rental Records. (Rental Record #589613312, 01 RT, ECF No. 14-8; Rental Record #589613312, 02 UP, ECF No. 14-9.[2]) Both of these Rental Records contain the Arbitration Provision, and Plaintiff signed each of them. (Rental Record

---

[2] There appears to be two Rental Records for this transaction because Plaintiff accepted the "Fuel Purchase Option," which increased his estimated charge and generated a new Rental Record. (*See* Rental Record #589613312, 01 RT; Rental Record #589613312, 02 UP.)

#589613312, 01 RT at 4–5; Rental Record #589613312, 02 UP, at 4–5.) Above his signature, the Rental Records note: "By signing below, You acknowledge that You have read, understand, accept and agree to the above and the Rental Terms, and You accept or decline the Optional Services as shown on [Page] 1 and [Page] 2." (Rental Record #589613312, 01 RT, at 5; Rental Record #589613312, 02 UP, at 5.)

Two and a half weeks later, on November 25, 2014, Plaintiff engaged in the rental transaction at issue at Hertz's John Wayne Airport location in Santa Ana, California. (Rental Record #589275985, 02 GN, ECF No. 14-10; Rental Record #589275985, 01 GS, ECF No. 14-11.) There are, again, two Rental Records for this transaction.[3] Plaintiff, however, did not sign the Rental Record he received when leaving Hertz's premises. (Rental Record #589275985, 02 GN, at 5.) Instead, the Rental Record provides on the signature line: "GOLD – SIGNATURE ON FILE." (*Id.*; *accord* Rental Record #589275985, 01 GS, at 5.) Hertz explains that for customers like Plaintiff "who are making Gold Program rentals, Hertz typically prints the phrase 'GOLD – SIGNATURE ON FILE' on the Rental Record's signature line, indicating that the customer has already provided a signature in connection with executing the Gold Agreement," and—in Hertz's view—has "therefore has agreed to be bound by the Rental Record for that particular rental."[4] (Schloss Decl. ¶ 8.)

Further, the Rental Record for November 25, 2014, contains different acceptance language than that found in the Rental Records signed by Plaintiff a few weeks prior. Instead of providing that Plaintiff agrees to the Rental Record's terms by "signing below," this Rental Record states: "By accepting the Car, You

---

[3] Plaintiff's Complaint only mentions him receiving a single Rental Record as he left Hertz's facility. (Compl. ¶ 31.) It appears a second Rental Record was generated when he upgraded his car. (*Compare* Rental Record #589275985, 01 GS, at 1–2 (listing a "2015 IMPALA" and including a print time of 8:07 p.m.), *with* Rental Record #589275985, 02 GN, at 1–2 (listing a "2013 CHALLENGER RT" at an additional expense of $50.00 per day and including a print time of 8:41 p.m.).)

[4] Hertz does not explain why it deviated from this convention for Plaintiff's prior rental at its Fort Lauderdale International Airport location and obtained his signature on those Rental Records.

Acknowledge that You have read, understand, accept and agree to the above and the Rental Terms . . . ." (Rental Record #589275985, 02 GN, at 5; *accord* Rental Record #589275985, 01 GS, at 5.) Consequently, Hertz submits that Plaintiff agreed to the Rental Record's terms when he accepted the Rental Record and departed the company's facility in its vehicle. Hertz accordingly now asks this Court to enforce the Rental Record's Arbitration Provision by compelling arbitration of the parties' dispute.

## II.  LEGAL STANDARD

The Federal Arbitration Act ("FAA") applies to contracts involving interstate commerce. 9 U.S.C. §§ 1, 2. The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2. The primary purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt Info. Scis., Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989). Therefore, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

Given this strong federal preference for arbitration and the contractual nature of arbitration agreements, "a district court has little discretion to deny an arbitration motion" once it determines that a claim is covered by a written and enforceable arbitration agreement. *Republic of Nicar. v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991). "In determining whether to compel a party to arbitration, a district court may not review the merits of the dispute[.]" *Esquer v. Educ. Mgmt. Corp.*, — F. Supp. 3d —, 2017 WL 5194635, at *2 (S.D. Cal. Nov. 9, 2017). Instead, a district court's determinations are limited to (1) whether a valid arbitration agreement exists

and, if so, (2) whether the agreement covers the relevant dispute. *See* 9 U.S.C. § 4; *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

## III.   ANALYSIS

Plaintiff raises a series of arguments to resist arbitration of his claims. (Opp'n 9:5–18:17, ECF No. 19.) They can be distilled into a single point: Plaintiff believes Hertz does not meet its burden to demonstrate he agreed to arbitrate this dispute. Ultimately, the Court disagrees. But before reaching this issue, the Court will resolve Hertz's threshold argument that the arbitrator—not this Court—should determine whether an agreement to arbitrate exists.

### A.   Responsibility for Determining Formation of the Agreement

The Rental Record's Arbitration Provision contains language delegating questions of arbitrability to the arbitrator. It provides that "all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision." (Rental Record #589275985, 01 GS, at 4.) Based on this language, Hertz argues the parties clearly and unmistakably intended for an arbitrator to decide threshold issues of arbitrability. (Mot. 12:2–3.) In the company's view, this clause means the arbitrator—as opposed to the Court—should even decide whether an agreement to arbitrate exists.

The Court is not convinced. The issue of arbitrability "is left to the court unless the parties clearly and unmistakably provide otherwise." *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011); *see also Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013). "Clear and unmistakable evidence of an agreement to arbitrate arbitrability 'might include . . . an express agreement to do so.'" *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208 (9th Cir. 2016) (quoting *Momot*, 652 F.3d at 988). If the parties unmistakably agree to arbitrate the "gateway issue" of

arbitrability, then this agreement is "simply an additional, antecedent agreement" that is subject to the FAA. *Rent–A–Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 70. (2010)

The problem with Hertz's position is it presupposes that an "agreement to arbitrate arbitrability" exists. *See Momot*, 652 F.3d at 988. Yet, Plaintiff challenges whether he agreed to the Arbitration Provision, including its delegation clause. This Court cannot enforce the delegation clause—let alone the remainder of the Arbitration Provision—without first concluding Plaintiff entered into an agreement. *See, e.g.*, *Quevedo v. Macy's, Inc.*, 798 F. Supp. 2d 1122, 1133 (C.D. Cal. 2011) (quoting *Van Ness Townhouses v. Mar Indus. Corp.*, 862 F.2d 754, 756 (9th Cir. 1988)) ("The threshold issue in deciding a motion to compel arbitration is 'whether the parties agreed to arbitrate.' "). After all, "arbitration is a matter of contract." *Rent-A-Ctr.*, 561 U.S. at 69. Plaintiff "cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 314 (2010) (alteration omitted) (quoting *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 582 (1960)); *see also* 9 U.S.C. § 4 (authorizing the court to compel arbitration once it is "satisfied that the making of the agreement . . . is not at issue"). Thus, despite that the parties may validly commit some threshold issues to the arbitrator, this Court must resolve "whether the clause was agreed to." *See Granite Rock Co.*, 561 U.S. at 297.

Accordingly, the Court—not the arbitrator—will determine whether Plaintiff agreed to the Arbitration Provision and its delegation clause.

### B. Formation Framework

The FAA authorizes enforcement of a "written provision" to arbitrate a dispute. 9 U.S.C. § 2. Courts generally "apply ordinary state-law principles that govern the formation of contracts" to decide "whether the parties agreed to arbitrate a certain matter (including arbitrability)." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). The party seeking arbitration has "the burden of proving

the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

To determine whether Plaintiff and Hertz agreed to arbitrate, the Court turns to California's principles governing the formation of contracts. *See, e.g.*, *Norcia*, 845 F.3d at 1289; *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014). "A contract is . . . an exchange of promises." *Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982, 1005 (2016) (quoting *In re Marriage of Feldner*, 40 Cal. App. 4th 617, 623 (1995)). Under California law, the essential elements of a contract are: "(1) parties capable of contracting; (2) their consent; (3) a lawful object; and (4) a sufficient cause or consideration." *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966) (citing Cal. Civ. Code § 1550).

This case hinges on the second element: the parties' consent. "There is no contract until there is mutual consent of the parties." *Deleon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012) (citing Cal. Civ. Code §§ 1550, 1565)). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Alexander v. Codemasters Grp. Ltd.*, 104 Cal. App. 4th 129, 141 (2002). Mutual consent is typically "manifested by an offer communicated to the offeree and an acceptance communicated to the offeror." *Donovan v. RRL Corp.*, 26 Cal. 4th 261, 271 (2001).

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his [or her] assent to that bargain is invited and will conclude it." *City of Moorpark v. Moorpark Unified Sch. Dist.*, 54 Cal. 3d 921, 930 (1991). "The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer." *Donovan*, 26 Cal. 4th at 271. However, when the recipient "does not know" that an

offer has been made, "this objective standard does not apply." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 993 (1972). Thus, regardless of an offeree's "apparent manifestation of . . . consent," the offeree is not "bound by inconspicuous contractual provisions of which [the offeree] was unaware, contained in a document whose contractual nature is not obvious." *Id.*; *see also Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc.*, 89 Cal. App. 4th 1042, 1049 (2001) (noting that a party is not bound by a document where it "does not appear to be a contract and the terms are not called to the attention of the recipient").

The second part of contract formation is acceptance. One form of acceptance is a signature to an agreement. *See Marin Storage*, 89 Cal. App. 4th at 1049 ("[O]rdinarily one who signs an instrument which on its face is a contract is deemed to assent to all its terms."). But a signature is not the only form of assent under California contract law. *E.g.*, *DeLeon*, 207 Cal. App. 4th at 812. Nor does the FAA require that the written arbitration provision be signed by the parties. *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1439 (9th Cir. 1994).

Another form of assent is acceptance by actions or conduct. *Esparza v. KS Indus., L.P.*, 13 Cal. App. 5th 1228, 1238 (2017). "One party may use the words and the other party may accept by words, actions or conduct." *Lane v. Superior Court*, 104 Cal. App. 340, 347 (1930). "Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal." (Cal. Civ. Code § 1854.) Relatedly, "[a] voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting." *Id.* § 1589; *see also Craig v. Brown & Root, Inc.*, 84 Cal. App. 4th 416, 420 (2000) (noting acceptance may be "implied-in-fact").

For instance, an agreement to arbitrate existed where an employee continued her employment after she received a memorandum providing for arbitration. *Craig*, 84 Cal. App. 4th at 416. The plaintiff's former employer in *Craig* established a

dispute resolution program that included mandatory arbitration. *Id.* at 418–19. In a memorandum sent to all employees, including the plaintiff at her home address, the employer explained the program and stressed that "everyone would be bound by it." *Id.* at 419–20. Plaintiff did not sign the memorandum or an acknowledgement of receipt of the document. *See id.* at 420. After being terminated several years later, the plaintiff brought suit, and the company moved to compel arbitration. *Id.* at 419–20. The trial court granted the petition, and the California Court of Appeal affirmed. *Id.* at 420, 423. The court reasoned that a party's acceptance of an arbitration agreement may be not only express, but also implied-in-fact. *Id.* at 420. Accordingly, because the plaintiff continued to work for the company after she received the dispute resolution memorandum, the court held she "thereby agreed to be bound by the terms of the Dispute Resolution Program, including its provision for binding arbitration." *Id.* at 422; *see also Harris v. Superior Court*, 188 Cal. App. 3d 475, 479–80 (1986) (stating that a physician's acceptance of the benefits of a health plan agreement to which he was not a party "necessarily entailed acceptance of the agreement that members' claims would be subject to binding arbitration").

In contrast, an agreement to arbitrate did not exist where a vehicle purchaser received a document providing for arbitration in connection with a bundled satellite radio service over a month after the service commenced. *Knutson*, 771 F.3d at 569. The plaintiff in *Knutson* purchased a Toyota vehicle that came with "a 90–day trial subscription to Sirius XM satellite radio." *Id.* at 562. More than a month after the satellite radio service was activated, the plaintiff received a "Welcome Kit" in the mail from Sirius XM containing its Customer Agreement. *Id.* The agreement provided that by using the service, the user agrees to the agreement's terms, including a mandatory arbitration clause. *Id.* at 563–64. The plaintiff later brought a consumer class action against Sirius XM, and the company successfully moved to compel arbitration. *Id.* at 564.

On appeal, the Ninth Circuit considered whether Sirius XM met its burden to demonstrate the plaintiff assented to its Customer Agreement under California law. *Knutson*, 771 F.3d at 565. The court concluded the company did not. *Id.* at 569. It highlighted that when the plaintiff purchased the vehicle, "he did not receive any documents from Sirius XM, and he did not know that he was entering into a contractual relationship with Sirius XM by using the service." *Id.* at 566. Thus, the plaintiff, "as far as he knew," was "only in a contractual relationship with Toyota." *Id.* Therefore, a reasonable person in the plaintiff's position "could not be expected to understand that purchasing a vehicle from Toyota would simultaneously bind him or her to any contract with Sirius XM, let alone one that contained an arbitration provision without any notice of such terms." *Id.* In addition, the court concluded the plaintiff's continued use of the satellite radio service after receiving the Welcome Kit in the mail did not constitute assent to the agreement. *Id.* The Ninth Circuit rationalized that, in view of the plaintiff's "lack of awareness of any contractual relationship with Sirius," he lacked a reason to even open the Welcome Kit from Sirius XM and read the documents therein. *Id.* at 567. Thus, no agreement was formed. *Id.*; *see also Norcia*, 845 F.3d at 1282, 1291 (concluding cellphone manufacturer did not meet its burden of demonstrating an agreement to arbitrate existed where the consumer purchased the cellphone from a cellphone service provider and an arbitration clause was included in a 101-page "Product Safety & Warranty Information" brochure inside the product box).

### C.  Formation of the Rental Record and Its Arbitration Provision

"While the Court may not review the merits of the underlying case '[i]n deciding a motion to compel arbitration, [it] may consider the pleadings, documents of uncontested validity, and affidavits submitted by either party.' " *Macias v. Excel Bldg. Servs. LLC*, 767 F. Supp. 2d 1002, 1007 (N.D. Cal. 2011) (quoting *Ostroff v. Alterra Healthcare Corp.*, 433 F. Supp. 2d 538, 540 (E.D. Pa. 2006)). Hertz, as the

party seeking to compel arbitration, bears the burden of demonstrating an agreement to arbitrate was formed. *See Norcia*, 845 F.3d at 1283. The company meets its burden.

Initially, there is no dispute that Plaintiff received the Rental Record containing the Arbitration Provision. "Hertz provides a customized Rental Record to every Hertz customer at the commencement of every rental," and each "Rental Record since September 2013 has contained the Arbitration Provision." (Schloss Decl. ¶¶ 5, 11.) Consistent with this policy, the company provides the customized Rental Record for Plaintiff's transaction. Further, Plaintiff admits in his Complaint that he accepted "a multipage, folded document called a 'Rental Record'" before driving off with his rental car. (Compl. ¶ 31.)

Hertz also demonstrates Plaintiff had ample reason to believe its Rental Record, including the Arbitration Provision within the document, was intended as an offer. The Rental Record is a document that appears to be a contract. It is filled with terms for Plaintiff's ensuing rental. And, after listing Plaintiff's estimated charges, the Rental Record states: "Further information relating to Your rental charges, and other terms to which You agree, appear below." (Rental Record #589275985, 02 GN, at 2.) In addition, the term Hertz seeks to enforce—the Arbitration Provision—is not an "inconspicuous contractual provision[]." *See Windsor Mills*, 25 Cal. App. 3d at 993. The agreement to arbitrate consumes a full page of the Rental Record and is preceded by the conspicuous warning to Plaintiff that:

**THIS AGREEMENT REQUIRES ARBITRATION OR A SMALL CLAIMS COURT CASE ON AN INDIVIDUAL BASIS, RATHER THAN JURY TRIALS OR CLASS ACTIONS**.

(*Id.* at 4.)

Aside from the Rental Record's appearance and contents, Plaintiff's multi-year relationship with Hertz supports that he had reason to believe the company was making him an offer. Plaintiff agreed to the Gold Agreement to become a Gold Status member and obtain the benefits associated with this status. At minimum, the Gold

Agreement put Plaintiff on notice that he would be receiving additional terms with each rental. (*See* Gold Agreement 3.) He also engaged in numerous rental transactions with Hertz. (Zaenger Decl. ¶ 4). Plaintiff previously signed Rental Records he received containing the Arbitration Provision. (*Id.* ¶ 5, Exs. 1, 2.) In short, Plaintiff "had reason to believe that" the Rental Record he received from Hertz "was intended as an offer." *See Donovan*, 26 Cal. 4th at 271. Further, these circumstances demonstrate that the arbitrability provisions were not "inconspicuous contractual provisions of which [the offeree] was unaware, contained in a document whose contractual nature is not obvious." *See Windsor Mills*, 25 Cal. App. 3d at 993.

Moreover, Plaintiff manifested his assent to the Rental Record. The Rental Record invited Plaintiff's acceptance by conduct—accepting and taking the company's rental car. (Rental Record #589275985, 02 GN, at 5 ("By accepting the Car, You Acknowledge that You have read, understand, accept and agree to the above and the Rental Terms . . . ."); *accord* Rental Record #589275985, 01 GS, at 5.) Plaintiff did so. He accepted the rental car and the customized Rental Record for his transaction. He then drove off of Hertz's lot.

Thus, this case is unlike *Knutson* discussed above—where the vehicle purchaser had no reason to believe he was entering into a contractual relationship with the satellite radio provider. *See* 771 F.3d at 555–56. In contrast to that purchaser, a reasonable person in Plaintiff's position would believe that renting a vehicle from Hertz—as a Hertz Gold Member at a Hertz location—would bind him to a contract he received from Hertz before leaving the company's lot with its vehicle. Accordingly, Hertz satisfies its burden of demonstrating Plaintiff agreed to the Rental Record and its Arbitration Provision.

Turning to Plaintiff's Opposition, he does not submit any evidence disputing that he agreed to the Rental Record. Where the making of the agreement is at issue, "[c]ourts have employed a summary judgment approach" and ruled "as a matter of law where there are no genuine issues of material fact." *Geoffroy v. Wash. Mut. Bank*,

484 F. Supp. 2d 1115, 1119 (S.D. Cal. 2007); *see also Three Valleys Mun. Water Dist. v. E.F. Hutton & Co.*, 925 F.2d 1136, 1141 (9th Cir. 1991) (indicating agreement with the Third Circuit that, where there is a doubt as to whether an agreement to arbitrate exists, the matter should be submitted to a jury and "[o]nly when there is no genuine issue of fact concerning the formation of the agreement should the court decide as a matter of law that the parties did or did not enter into such an agreement"). Confronted with Hertz's evidence in support of its motion to compel, Plaintiff provides no substantiation for his unsworn allegations or the inferences he suggests this Court draw from his pleading—including that he possibly lacked a reasonable opportunity to review the Rental Record or that the Rental Record's terms were not known to him before he accepted the rental car and left Hertz's premises.

For example, Plaintiff does not submit a declaration stating he did not receive the Rental Record at the time of the transaction or that he was not given an opportunity to review it. *See Knutson*, 771 F.3d at 563 (quoting the plaintiff's declaration submitted in opposition to the defendant's motion to compel arbitration); *see also, e.g.*, *Anderson v. Credit One Bank, Nat'l Ass'n*, No. 16-cv-3125-MMA (AGS), 2017 WL 2258064, at *3 (S.D. Cal. May 23, 2017) (finding the defendant failed to meet its burden of demonstrating mutual assent where the plaintiff declared he did not receive the relevant contract and was never notified that he was bound to arbitrate disputes in connection with his use of the defendant's service); *Ferguson v. Countrywide Credit Indus., Inc.*, No. CV00-13096AHM(CTX), 2001 WL 867103, at *1 (C.D. Cal. Apr. 23, 2001) (concluding the plaintiff created a genuine dispute where she asserted in her declaration "that the signature on the purported agreement is not hers and that she had never seen the purported agreement until her attorney showed it to her"). Thus, resolving this issue based on the evidence before the Court is appropriate.

Finally, the Court is unpersuaded by Plaintiff's ancillary arguments seeking to undercut the formation of the Rental Record and its Arbitration Provision. For instance, Plaintiff highlights that since his rental, Hertz chose to "move its Rental Records' arbitration language to its standardized Gold Terms." (Opp'n 16:16–17.) Plaintiff argues that "[h]ad this change been unnecessary to achieve the enforceability of Hertz's arbitration clause, Hertz—still, a rational, profit-maximizing company, would neither have spent time nor money doing so." (*Id.* 16:17–19.) This point misses the mark. The Court need not speculate why Hertz opted to modify its approach to obtaining Gold Members' consent to arbitration. The focus here is whether Plaintiff agreed to the terms he received for his November 25, 2014, rental—not whether Hertz has since improved on its approach.[5]

Plaintiff also attempts to draw a dispositive distinction based on when he admits to receiving the Rental Record. Plaintiff alleges he received the Rental Record from an agent as he was exiting Hertz's premises in a queue of rental cars—as opposed to before he got into his vehicle. (Compl. ¶ 31.) Plaintiff believes this distinction should mean the Rental Record is not part of his agreement with Hertz—despite that he accepted the document from an agent before taking Hertz's car from its facility. (*See id.* ¶¶ 36, 39–40.)

This point is unconvincing. The arrangement Plaintiff attacks is the one he agreed to by becoming a Gold Member. The Gold Agreement put Plaintiff on notice

---

[5] The Court is unpersuaded by Plaintiff's arguments concerning California's incorporation by reference doctrine. In Plaintiff's view, whether he agreed to arbitration should hinge on whether the 2006 Gold Agreement incorporated by reference the November 25, 2014, Rental Record containing the Arbitration Provision. (Opp'n 11:14–16:26.) Hertz responds that Plaintiff's "effort is misguided from the start because Hertz does not contend that the 2014 John Wayne Airport Rental Record was incorporated by reference at the time plaintiff signed the Gold Agreement in 2006." (Reply 3:21–23.) Instead, Hertz states its position is that "the parties expressly agreed in the Gold Agreement that their contractual relationship would be supplemented for each future rental by the terms contained in each future Rental Record." (*Id.* 3:23–25.) In substance, the Court agrees. The lynchpin here is not whether Plaintiff bound himself to the Arbitration Provision when he clicked the "I Agree" button for the Gold Agreement back in 2006, but rather whether he later agreed to the specific terms he received in the November 25, 2014, Rental Record, including its Arbitration Provision, when he received the document and accepted the rental car.

that he would receive—at the time of a rental—"a written document (called a 'Rental Record' or 'Rental Agreement') which contains specific terms of that rental" and "may also contain other information pertaining to Car rentals in the jurisdiction in which the rental commences." (Gold Agreement 2.) Hence, although Plaintiff was able to proceed directly to the stall where his rental car "awaited with the keys inside," he had not yet received the anticipated Rental Record for his Gold Program rental. The Court therefore rejects Plaintiff's argument that his contractual relationship was complete before he received the Rental Record. Moreover, the circumstances here are distinguishable from other cases where a significant delay in receipt of an arbitration provision indicated the parties did not form an agreement to arbitrate. *See, e.g.*, *Knutson*, 771 F.3d at 564 (noting the plaintiff received the agreement containing the arbitration clause "over one month after the service was activated"); *Perez v. DirecTV Grp. Holdings, LLC*, 251 F. Supp. 3d 1328, 1338 (C.D. Cal. 2017) (reasoning no agreement was formed where the relevant document was only mailed to the plaintiff after the equipment was already installed and the accompanying service was activated).

In sum, because Plaintiff had ample reason to believe the Rental Record containing the Arbitration Provision was an offer, and because Plaintiff accepted the Rental Record in taking the rental car, the Court concludes Hertz meets its burden of proving the existence of an agreement to arbitrate.

### D. <u>Delegation of Arbitrability Determination</u>

Given that Plaintiff agreed to the Arbitration Provision, he also agreed to its delegation clause, which provides that "all issues are for the arbitrator to decide, including his or her own jurisdiction, and any objections with respect to the existence, scope or validity of this Arbitration Provision." (Rental Record #589275985, 02 GN, at 4.) Plaintiff contends the delegation clause is inapplicable because it includes the antecedent language "In any arbitration under this Arbitration Provision" before

17cv1083

providing that "all issues are for the arbitrator to decide . . . ." (Rental Record #589275985, 02 GN, at 4.) He argues this language "assumes the existence of an arbitration, which by the Rental Record's language triggers only in—not preceding—an arbitration." (Opp'n 11:5–7.) The Court is unmoved. The issue here is whether the parties have clearly and unmistakably delegated to the arbitrator the authority to decide arbitrability. The clause plainly provides they have done so.[6] Consequently, the Court finds the parties have clearly and unmistakably delegated arbitrability issues to the arbitrator.[7] *See Brennan*, 796 F.3d at 1131; *Mohamed*, 848 F.3d 1201 at 1208.

Accordingly, the Court will grant Hertz's motion to compel arbitration and require the parties to submit to the arbitrator whether their dispute is arbitrable.

## IV.   <u>CONCLUSION & ORDER</u>

In light of the foregoing:

1.    The Court **GRANTS** Hertz's motion to compel arbitration (ECF No. 14).

2.    The Court **TERMINATES AS MOOT** Hertz's motion to dismiss Plaintiff's claims (ECF No. 14).

3.    The Court **STAYS** this action as to all parties and all claims. *See* 9 U.S.C. § 3.

4.    The Court further **ORDERS** the parties to proceed to arbitration for a determination of arbitrability and possible arbitration of Plaintiff's

---

[6] Further, regardless of the delegation clause, the Arbitration Provision incorporates the American Arbitration Association's rules. (Rental Record #589275985, 02 GN, at 4.) The parties' incorporation of these rules also serves as clear and unmistakable evidence of an agreement to arbitrate arbitrability. *See, e.g.*, *Brennan v. Opus Bank*, 796 F.3d 1125, 1131 (9th Cir. 2015).

[7] The Court also notes Plaintiff does not challenge the delegation clause on any other ground, such as unconscionability. *See Rent-A-Ctr.*, 561 U.S. at 70 (providing a delegation provision "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce" and "is valid under § 2 'save upon such grounds as exist at law or in equity for the revocation of any contract'").

1  claims in the manner provided for in the Rental Record's Arbitration

2  Provision. *See* 9 U.S.C. § 4.

3  5.  The Court directs the Clerk of the Court to **ADMINISTRATIVELY**

4  **CLOSE** this action. The decision to administratively close this action

5  pending the resolution of the arbitration does not have any jurisdictional

6  effect. *See Dees v. Billy*, 394 F.3d 1290, 1294 (9th Cir. 2005) ("[A]

7  district court order staying judicial proceedings and compelling

8  arbitration is not appealable even if accompanied by an administrative

9  closing. An order administratively closing a case is a docket

10  management tool that has no jurisdictional effect.").

11  **IT IS SO ORDERED.**

12

13  **DATED: March 12, 2018**

14  Hon. Cynthia Bashant
   United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28